SPECTOR, Judge,
(dissenting):
I respectfully dissent from the opinion of the court’s majority.
The conclusion of the court that the order of the Division of Pari-Mutuel Wagering and subsequent order of the Board of Business Regulation are reviewable by petition for certiorari is contrary to the holding of the Florida Supreme Court in West Flagler Amusement Company, Inc. v. State Racing Commission et al., 122 Fla. 227, 165 So. 64 (1935). That case was a certiorari proceeding seeking to have quashed an order of the State Racing Commission relating to the apportionment of dog racing dates in Dade County between Flagler, Biscayne and the beach tracks. At the same time said certiorari proceeding was before the court, there was also pending in that court a mandamus proceeding on relation of West Flagler Amusement Company, Inc. seeking the same relief as had been asked for in the certiorari proceeding. The court quashed the certiorari proceeding because it was not an appropriate method for reviewing an order apportioning racing dates among dog tracks, stating at page 66:
“A bare inspection of paragraph (1) of section 2 of chapter 17276, Acts 1935, supports the contention of the respondent state racing commission in this case that the statutory powers thereby vested and authoriaed to be exercised by the commission are wholly devoid of any judicial attributes or quality, procedural in nature, or otherwise; therefore, certiorari is not an available remedy to attack an order of the commission purporting to have been made solely under authority of that paragraph and section of the 1935 statute. The writ of certiorari is accordingly quashed and the proceeding dismissed without prejudice to the maintenance of petitioner’s mandamus proceeding now pending in this court and involving the same identical controversy comprehended in the instant case.”
The majority opinion acknowledges the court’s holding in West Flagler Amusement Co., Inc., supra, but holds that said decision is no longer controlling because of the subsequent amendments to the statute which have changed the powers, duties and functions of the Racing Commission. In my view, the amendments have not changed the nonjudicial character of an order apportioning racing dates which led the Supreme Court to hold that such orders were not reviewable by certiorari. Such an order is, I believe, quasi-executive or quasi-legislative in character and should be reviewed by mandamus.
*61 Biscayne contends that the order allocating racing dates to it is contrary to law in that in determining the dates to be approved the division took into consideration the dates to be awarded the Hollywood track. Flagler makes the same contention of illegality in its mandamus action. Flagler and Biscayne contend that under the provisions of Section 550.083 the Division has no authority to determine dates to be approved for the three Dade County tracks based upon consideration of the dates to be approved for the Hollywood track. I believe that contention is well taken. Section 550.083, Florida Statutes, F.S.A., contemplates that each dog track choose its own operating dates:
“§ 550.083(1) Owners of valid outstanding permits for dog racing in this state may hold race meetings at any time they choose during the calendar year for the aggregate number of racing days fixed and permitted by law and subject to the approval of the state racing commission; * * * >»
While the cited statute provides that the choice of racing dates shall be subject to the approval of the Commission, I do not believe that such approval can be withheld by the Commission in absence of a showing that the dates chosen will have a detrimental effect upon the racing industry or, more importantly, an impairment of the State’s revenue from pari-mutuel wagering. It is clear from the record before the court that the apportionment of dates made by the Commission had as its principal ingredient the desire and intent to shift the wagering action to the Hollywood track during the height of the winter season by affording a minimum of competition from the three Dade tracks during that period. I doubt that the Legislature intended the Commission to apportion dates under any system which departs from the so-called county unit system. In departing from that longstanding method, the Commission arbitrarily and without statutory authority violated the legislative mandate as found in Section 550.02(1) that it “(1) Fix and set the dates for racing in any county where there are * * * one or more dog tracks * * * apportioning such dates to the several tracks in such counties, as provided by law; * *
The respondents herein argue, and the majority of the court holds, that the legality of the Commission’s method of apportionment of dates received the approval of the Supreme Court in State ex rel. Inv. Corp. of South Florida v. Board of Business Regulation, 227 So.2d 674. It is difficult for me to agree that anything the court said about the 52-52 plan is entitled to a higher dignity as precedent than the most obvious form of obiter dicta. The court quashed the Board’s order reversing the Division’s allocation of dates because the petitioner there had not been made a party to the proceedings in which the Board reversed the Division’s allocative order. In brief, the court held the Board had no jurisdiction to reverse the Division.
There is yet another and perhaps more compelling reason why the order of allocating dates among the tracks should be reversed. There can now be no question that the principal interest which the State has in pari-mutuel wagering centers upon the revenue gained by the State from the operation of the various tracks. I do not say that revenue is the sole and exclusive factor to be considered. Nonetheless it is a principal and substantial factor. In State ex rel. Hollywood Jockey Club v. Stein, 129 Fla. 777, 176 So. 849 (1937), the court commenting upon the nature of the Commission’s duty in fixing racing dates stated:
“ * * * It is the duty of the commission to look to the interest of the state, which receives revenue for the operation of the track, and to the interests of the permit holder, who proposes to operate the track for profit.”
The State’s interest in the revenue producing facet of this activity was also considered by the court in State v. Florida State Racing Commission, 70 So.2d 375 *62 (Fla.1953), and Biscayne Kennel Club, Inc. v. Florida State Racing Commission, 165 So.2d 762 (Fla.1964).
The petitioner in this case, Biscayne, as well as the petitioner in the companion mandamus action, Flagler, has submitted figures both by way of testimony before the Division and exhibits tendered to the Board during the course of arguments before it which they claim demonstrate that the allocation of dates made by the Division has resulted in a reduction of state revenue because of a lower total of funds wagered in the Dade County tracks. The majority of the court accepts the contention of the respondents that the figures submitted in support of such proof are conjectural and speculative and thus not worthy of consideration. That the figures submitted by the petitioners are self-serving does not necessarily make them unworthy of belief, although they certainly should be looked upon in light of the source.
However, it seems to me that it is unnecessary to rely upon the figures advanced by petitioners in these cases in order to conclude that the state coffers are paying a high price indeed for the innovative allocation of dates made by the Division. We need only to look at the exhibits submitted by the respondents, Board of Business Regulation and Miami Beach Kennel Qub, to find support for the thesis of petitioners concerning the reduced handle resulting from the 52-52 plan. The figures submitted by the beach track are statistically similar to those provided by the Board, but the former are more convenient for analytical purposes so I refer to those. During the 1968-69 dog racing season, the three Dade County dog tracks handled $130,456,888.00 in pari-mutuel wagering. The same three tracks in the 1969-70 fiscal year operating under the 52-52 plan did $135,337,644.00, an increase of some $4,800,-000.00 or 3.6 percent over the previous year. At the same time, the figures of the respondents show that the thirteen dog tracks outside the Dade-Broward area increased their total handle by 14.65 percent. Significantly, during this period the Hollywood track experienced a 35 percent increase in its handle. Contrary to the views of the respondents, one need not speculate to conclude that the minute increase in business done by the three Dade tracks has failed to keep pace with the increase in the rest of the State to the detriment of state revenues. The tracks not affected by the 52-52 plan racked up a percentage increase five times that of the three Dade tracks. And, not insignificantly, the Hollywood track with its 35 percent increase over the previous year outperformed the three Dade tracks by a ten to one percentage increase.
Even though the three tracks in Dade showed a slight increase over the previous year, if such figures were adjusted to reflect that some $10,000,000.00 of the handle in the three Dade tracks during the 1969-70 season is attributable to the fact that they ran 52 more matinee sessions than in the preceding year, the net result would be that the three Dade tracks did $5,000,000.00 less business than the preceding year when the three Dade tracks were permitted to choose their own dates of operation without interference by the Division.
It seems inescapable to me that the Division’s resort to the 52-52 plan inures to the benefit of the Hollywood track only at the expense of the three Dade tracks. Because it totally disregards the revenue raising ability of the three Dade tracks, the 52-52 plan is arbitrary and predicated upon factors other than law, thus rendering the Division’s discretion abusive.
I would quash the order allocating dates being reviewed herein and require the Division to approve operating dates for each of the three tracks in Dade County in accordance with the dates chosen by each of such tracks in their respective applications.